UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY COUNSELORS, *
*et al.*, *
\*
    Plaintiffs, *
\*
    v. *    Civil Action No. 1:13-cv-00556 (RC)
\*
DEPARTMENT OF JUSTICE, *
\*
    Defendant. *
\*
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, DISCOVERY**

Plaintiffs National Security Counselors ("NSC"), Jeffrey Stein ("Stein"), and Truthout brought this case against Defendant Department of Justice ("DOJ") after two components—the Federal Bureau of Investigation ("FBI") and the Civil Division ("Civil")—made multiple adverse fee-related determinations regarding their respective Freedom of Information Act ("FOIA") requests. (Compl., Dkt. # 1, ¶¶ 25, 42, 49, 52, 70, 74 (filed Apr. 24, 2013).)[1] Plaintiffs similarly sought judicial review of FBI's policy of blanketly insisting on limiting its releases of electronic records to approximately 500 pages per CD even when specifically requested not to (the "CD Policy"). (*Id.* ¶ 61.) On 17 September 2013 DOJ filed a Motion for Summary Judgment under Rule 56(a) of the Federal Rules of Civil Procedure.

---

[1] Even though DOJ is the only proper party defendant, this brief will treat FBI as a "defendant" when discussing FBI policies or practices to avoid confusion.

# BACKGROUND

## Factual and Procedural Background

Except as specifically indicated otherwise, Plaintiffs accept DOJ's recitation of the factual and procedural background of its Motion (Mem. P. & A. Supp. Def.'s Mot. Summ. J., Dkt. #12, at 3-6 (filed Sept. 17, 2013) [hereinafter DOJ's Mem.].) and will not unnecessarily repeat it here. However, while the Government has limited its discussion of Counts 1, 2,[2] and 4[3] to the factual background, FBI's discussion of Count 3 is largely comprised of conjecture, conclusory assertions, and argument that Plaintiffs vigorously dispute.

Plaintiffs do not dispute FBI's descriptions of the typical workload of the Record/Information Dissemination Section ("RIDS") and its three-queue system of FOIA processing. (*Id.* at 4.) The remainder of the discussion of Count 3, on the other hand, relies solely on the self-serving declaration of FBI's primary witness, David Hardy, regarding the purpose and effect of the policy in question. Hardy's conclusions are unsupported by the testimonial "evidence" he provides in support of them, and the record suffers noticeably from the lack of *any* Administrative Record regarding the promulgation of a policy FBI would have the Court believe was developed after much research, thought, and discussion. Therefore, the only statement regarding the FBI policy to which Plaintiffs can stipulate in this section is the fact

---

[2] As an initial note, due to the fact that FBI unilaterally reversed its previous position and released the records which were the subject of Counts 1 and 2, Plaintiffs agree that those counts are now moot.

[3] Defendant inexplicably also references a Count 5, which Plaintiffs presume is a reference to the second request at issue in Count 4.

2

that in January 2010 FBI instituted a policy of artificially limiting its release of electronic records to approximately 500 pages per CD.[4]

## Statutory Background and Standard of Review

Plaintiffs accept DOJ's recitation of the Standard of Review, but will add some further information.

First, the prohibition against the consideration of extrinsic evidence in a case involving a fee dispute cuts both ways. Just as a plaintiff cannot introduce evidence in support of a fee category or fee waiver which was not presented to the agency, an agency cannot introduce arguments it did not make at the administrative stage. The Court may not consider reasons not offered by the agency in the denial letter. *See Friends of the Coast Fork v. Dep't of the Interior,* 110 F.3d 53, 55 (9th Cir. 1997) ("The agency must stand on whatever reasons for denial it gave in the administrative proceeding. If those reasons are inadequate, and if the requesters meet their burden then a full fee waiver is in order."); *Independence Mining Co. v. Babbitt,* 105 F.3d 502, 511-12 (9th Cir. 1997) (citing *Indus. Union Dep't v. Am. Petroleum Inst.,* 448 U.S. 607, 631 n.31 (1980)); *Manley v. Dep't of the Navy*, No. 07-721, 2008 U.S. Dist. LEXIS 111499, at *12 (S.D. Ohio Sept. 22, 2008) ("There is nothing in the Navy's denial decision indicating the Navy took exception to plaintiff's reliance on the Navy's publications or actions in supporting his request for a fee waiver . . . .") (citing *Coast Fork*); *W. Watersheds Proj. v. Brown*, 318 F. Supp. 2d 1036, 1039 (D. Idaho 2004) ("[T]he district court may not consider reasons not offered by the agency in the denial letter.") (citing *Coast Fork*); *Inst. for Wildlife Prot. v. U.S. Fish and Wildlife Serv.*, 290 F. Supp. 2d 1226, 1228 (D. Or. 2003) ("The agency must adhere to the reasons given

---

[4] DOJ's bare Administrative Record for the fee determinations made regarding Count 4 is similarly missing any documentation regarding *how* the adverse determinations were made,

at the administrative level to prove their case and cannot later employ post hoc rationales . . . .") (citing *Coast Fork*); *Judicial Watch, Inc. v. GSA*, No. 98-2223, 2000 U.S. Dist. LEXIS 22872, at *14 (D.D.C. Sept. 25, 2000) ("[T]he court may not consider new reasons by the agency that were not advanced in its denial letter.") (citing *Coast Fork* and *Indus. Union Dep't*); *Landmark Legal Found. v. IRS*, No. 97-1474, 1998 U.S. Dist. LEXIS 21722, at *7 (D.D.C. Sept. 22, 1998) ("Information, theories, and evidence newly introduced by the parties in their summary judgment papers cannot be considered.") (citing *Coast Fork*).

Similarly, it logically follows that if a rationale was advanced in an initial determination and then disavowed in an appellate determination letter, the Court cannot consider the previously retracted rationale, as the later statement that "that was not the argument we made" is evidence that the argument in question was "not advanced in its denial letter." *See Judicial Watch, Inc. v. GSA*, 2000 U.S. Dist. LEXIS at *14. An initial rationale that was expressly disavowed by the agency during the administrative stage is no less "post hoc" if offered in litigation than one truly absent from the Administrative Record.

Third, while the Court generally does not consider extrinsic evidence in such cases, "the administrative record . . . should be supplemented . . . if the existing record is insufficient to permit meaningful review." *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). The Court's review "is to be based on the *full administrative record* that was before the [agency] at the time [it] made [its] decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (emphasis added).

Lastly, Defendant consistently refers to the "deference" that is owed to its policy determinations (Def.'s Mem. at 3, 13), but the law is clear that no agency is entitled to

---

containing as it does only copies of the final determination letters themselves.

4

deference—*Chevron* or otherwise—in a FOIA context.  Because FOIA applies government-wide and no one agency administers it, no agency is entitled to *Chevron* deference in interpreting its provisions.  *Am. Civil Liberties Union v. DOD*, 543 F.3d 59, 66 (2d Cir. 2008) (citing *Al-Fayed v. CIA,* 254 F.3d 300, 307 (D.C. Cir. 2001)); *Tax Analysts v. IRS*, 117 F.3d 607, 613 (D.C. Cir. 1997) ("One agency's interpretation of FOIA is therefore no more deserving of judicial respect than the interpretation of any other agency.").

## ARGUMENT

### I.  ALL ADMINISTRATIVE RECORDS ARE INCOMPLETE

As an initial matter, the Court should deny Defendant's Motion for the simple reason that it has not provided the full Administrative Record to the Court.  As stated above, the "whole record" must be provided to the Court, not just those portions of it which support Defendant's position.  *See id.* at 419 (remanding case to district court to remedy failure to review "whole record" under the APA).  Because Defendant has not provided any documentation to the Court to prove that the reasons cited in the Hardy Declaration for promulgating the CD Policy were actually part of the decisionmaking process, the Court should find that Mr. Hardy's statements are merely "post hoc rationalizations" and reject them accordingly.  *See id*.  ("The lower courts based their review on the litigation affidavits that were presented. These affidavits were merely '*post hoc*' rationalizations, which have traditionally been found to be an inadequate basis for review.") (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168-69 (1962), and *SEC v. Chenery Corp*., 318 U.S. 80, 87 (1943)).  At the very least, the Court should order DOJ to provide the "whole record" regarding the CD Policy and the resolution of administrative appeals of it, if not order discovery to flesh out the information missing from the Administrative Record.

At most, it should simply disregard all of Mr. Hardy's statements and find that FBI has failed to justify its policy.

As noted above, DOJ's determinations in Count 4 suffer a similar lack of support, which is both more and less problematic than FBI's situation. It is admittedly less problematic because in the case of Count 4 the Court at least has *some* evidence of what rationales were relied upon in the final analysis at the agency level (although that evidence is still less than clear), even if it does not have any evidence of what other information was considered (or not considered). However, it is more problematic for two reasons: 1) the records are easily accessible; and 2) the record as established in the case calls into question whether or not the rationale DOJ claims to have applied actually was applied.

On the first item, while Plaintiffs do not know exactly what form the records in the missing FBI Administrative Record would take, Plaintiffs know *exactly* what form the records in the missing DOJ Administrative Record take. In the course of every appeal processed by the DOJ Office of Information Policy ("OIP"), OIP reviewers keep meticulous records of every step taken and every rationale examined, not least among which is a ubiquitous processing form (sometimes called a "Blitz Form") created for each appeal. Examples of such OIP records are attached as Ex. A; while most of these examples are Blitz Forms, they take other forms as well. (*See* Ex. A at 19-24, 30-32, 47.)[5] The fact that these records are both so clearly relevant and so easily obtainable—OIP stores each appeal case file in a separate folder and can locate them with ease—should cause the Court to seriously question Defendant's decision to not provide them to the Court.

---

[5] Additionally, Blitz Forms and related documentation would be created for each of Plaintiffs' respective appeals of the CD Policy, yet they too are strangely absent.

On the second item, there is a clear question of material fact regarding which rationale was relied upon by DOJ with respect to the determination that the information in question was publicly available, and the Court should insist upon reviewing the whole administrative record before making a finding of fact. Over the life span of these requests DOJ has presented a "moving target" of rationales to try to justify this determination, choosing and discarding arguments with relative abandon, appearing to be motivated only by which argument will secure the greatest advantage at any given time.

First, Civil stated that disclosure of the information requested "would not lead to an increased public understanding of the activities and operations of the federal government" because the records were "publicly available" without any written explanation of the basis for that determination. (Dkt. #12-3 at 23.)[6] However, DOJ's declarant James Kovakas issued this letter three days after explaining on the telephone to the undersigned that he considered the records to be "publicly available" simply because they were filed on the public record in court cases. (McClanahan Decl. ¶ 8, attached as Ex. B.) Moreover, in that telephone call—referenced in DOJ's first denial letter (*see* Dkt. #12-3 at 23)—Mr. Kovakas argued that he was reaching this conclusion for the same reason he reached it regarding a previous NSC request for similar records—that the records "could also be found in court files in the districts in which the cases were held." (*See* McClanahan Decl. ¶¶ 4-6, Ex. 2; *see also* Dkt. #12-3 at 23 ("This request is almost identical to your request in May 2010.").) Yet no records documenting the relationship between the requests—even though it was mentioned—or the rationales for the earlier

---

[6] The fee waiver for the other Civil request was similarly rejected because "the representation of federal agencies in FOIA litigation is a matter of public record" without any explanation for that determination. (*Id.* at 8.)

7

determination are in the Administrative Record; the record does not even include any notes from the telephone discussions between Mr. Kovakas and the undersigned in the context of *any* of the requests, even though it is undeniable that those discussions were "in the record" when Mr. Kovakas made his determinations.[7]

After NSC appealed these determinations, arguing that availability in courthouses across the country did not meet the requirement for "publicly available" (*see* Dkt. #12-3 at 10-11, 25-26), OIP explicitly disavowed Mr. Kovakas' argument, stating, "If your concern is that requesters 'must personally visit the courthouse' as you stated in your letter of appeal, I disagree; there is no such statement in Mr. Kovakas' letter dated October 17, 2011.  There is no need, as you suggest, for a requester to visit any courthouse whether the responsive declaration is pre- or post-Electronic Case Filing." (*Id.* at 32.)  After retracting the argument about public availability in court filings, OIP stated that its affirmation was based on *another* rationale:

> The point being made that you appear to have missed is that for responsive records located in Civil Division's files—in this instance copies of publicly filed declarations from public proceedings—the Civil Division can provide them to you if you are willing to be bound for fees in the amount estimated by Mr. Kovakas.

(*Id.*)  In other words, the records were "publicly available" because DOJ would release them if NSC paid a fee—something that can pretty much be said for every non-exempt agency document, thereby perversely limiting public interest fee waivers to only those records which are being withheld.

Now that this request has entered into litigation, DOJ tries to reverse its position yet again, going back to the original argument made by Mr. Kovakas on the phone, about which OIP

---

[7] It is unclear if Mr. Kovakas' processing file would have been provided to OIP in the appeal stage.  A copy of OIP's case file for these appeals would provide this information.

clearly stated, "there is no such statement in Mr. Kovakas' letter dated October 17, 2011" (*id.*). (*See* DOJ's Mem. at 19 n.5 ("As those letters reflect, OIP was explaining to NSC that a fee waiver was not appropriate because *the information was publicly available through court dockets (as the Civil Division had determined . . . .*") (emphasis added)).

The record is so muddied at this point on the question of what rationales were relied upon by DOJ that, if the Court would be convinced by one but not the other, meaningful review is virtually impossible without further information. *See Axiom Res. Mgmt.* 564 F.3d at 1381. As with FBI above, the Court should at least order DOJ to provide the "whole record" regarding its determinations, if not order discovery to flesh out the information missing from the Administrative Record. At most, it should find that DOJ's shifting explanations fail to justify its determinations and in fact create an inference of pretext akin to that discussed in employment discrimination law. *Cf. Appelbaum v. Milwaukee Metro Sewage*, 340 F.3d 573 (7th Cir. 2003) (finding that pretext can be reasonably inferred in employment discrimination cases from an employer's shifting or inconsistent explanation for a decision); *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 661 (9th Cir. 2002) (reasoning that giving differing justifications suggests that none of those reasons was the true reason for the action); *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1024 (8th Cir. 1998) (numerous inconsistent explanations by employer may establish pretext).

For the foregoing reasons, the Court should order Defendant to provide the whole Administrative Record, order discovery to fill in the gaps in the current record before the Court, or, alternatively, find that Defendant failed to meet its burden and that on the basis of the current record, award summary judgment to Plaintiffs.

## II.     THE CD POLICY

Even if the Court gives credence to the testimony of David Hardy and does not require more information, FBI's stated reasons for promulgating the CD Policy are insufficient to satisfy the strictures of FOIA, and in some instances are factually inaccurate, or at best unconvincing. First, contrary to FBI's assertion, it has failed to prove that its policy does not charge requesters more than the direct cost of duplication, therefore violating FOIA and DOJ regulations. Second, and relatedly, FBI appears to be charging personnel time for work done automatically by a computer system, which is not allowed. Third, FBI's claim that this policy is "faster" is unsupported by any evidence other than Mr. Hardy's conclusory statement saying so, and simple logic urges a different conclusion.

### A.     FBI May Be Charging More than Direct Costs

FBI recognizes and acknowledges that, "as long as the FBI is not charging FOIA requesters more than its direct costs in making . . . interim releases . . . , the FBI's practice complies with the statute." (Def.'s Mem. at 12.) However, FBI's only evidence in support of the assertion that using the CD Policy does not charge more than the direct costs is Mr. Hardy's unsupported statement, "The cost of running the Integrity protocols for a CD release alone exceeds the assessed $15.00 per CD fee." (Hardy Decl. ¶ 33(c).)[8] While the statement that running Integrity on a *single CD* costs more than $15 is true, FBI has *not* shown that running Integrity on a single CD holding 23,898 pages[9] would cost more than the price of *forty-eight*

---

[8] For some reason FBI also keeps stating that $15 per CD is less expensive than paper copies, which is neither contested nor relevant.

[9] This sample figure is reached by taking the total number of pages in the recent MAOP release—495 (Hardy Decl. ¶ 20)—and the size of the Adobe Acrobat file containing them—14.5 megabytes—and calculating the number of pages that would fill a standard CD—700 megabytes.

*CDs*—$710.  Mr. Hardy states, "The running of these security protocols, and resolving any issues that may arise, can require a significant amount of effort and time *that increases as more pages are added*" (*id.* (emphasis added)), but he does not state *how much* adding more pages adds to the cost.  Some relatively simple math demonstrates that if the maximum employee salary was used—$55.46/hr—and the addition of 500 pages caused the process to take 10% longer, one CD with 23,898 pages would cost $261.26, well below $710.  Changing 10% to 25% yields a cost for one CD of $584.15, still below $710.  In fact, each 500 additional pages would have to add *30.67%* to the Integrity time to make that one CD cost $710, and then only with a GS-13 doing all of the work herself.  Until Mr. Hardy actually proves that the direct cost of producing a CD is greater than the cost charged under the CD Policy, the Court should not simply take his word for it.

      **B.**      **FBI May Be Charging Personnel Time for Automated Tasks**

Mr. Hardy states that "it generally takes approximately 50 minutes to set up *and run* the Integrity scan for 500 pages."  (*Id.* ¶ 33(d) n.18 (emphasis added).)  However, he describes the work of the Integrity program as follows:

> Specifically, the FBI employs a security software application ("Integrity") that must be employed every time information is taken from the classified network and released to a requester in an unclassified format.  This entails running a general security protocol, whereby *Integrity scans* for prescribed code words; and an individualized protocol, whereby *Integrity scans* for words that RIDS determines are unique to the particular request and may include searches for specific exempt words, names, confidential sources, or classified techniques.

(*Id.* ¶ 33(c) (emphasis added).)  This description describes an automated program that is set up and programmed with words to search for and then *started*.  It then runs until it is done, without any human interaction except if there is a problem.

Plaintiffs stipulate that personnel time may be charged for the actual work of programming an Integrity session. However, personnel time may *not* be charged for the time Integrity runs by itself, and any statement regarding the relationship between $15 per CD and direct costs cannot include improper personnel time in the "direct costs" column. The Court should require Mr. Hardy to testify as to how much of the 50 minutes he mentions is actually spent *setting up* an Integrity session as opposed to the scan *running*, and adjust the figures presented in Subsection A *supra* accordingly.

### C. FBI's Estimate of Time Saved Is Problematic

Mr. Hardy states that this policy allows multiple analysts to process responsive records in parallel by allowing each analyst to review and process a 500 page-page of the total. (*See id.* ¶ 33(b).) However, this rationale makes little sense when one considers that documents are not burned to CD until *after* the reviewers finish processing them for exemptions. Consider the following example. Suppose that FBI determines that 1000 pages are responsive to a particular request. Two reviewers are assigned 500 pages each to review. The first reviewer withholds 300 pages, and the second reviewer withholds 200 pages. If each reviewer's "yield" is then burned to a CD (which is the only way in which "the 500-page size has proven ideal for reviewing officials" (*id.*) makes sense), then the requester receives two CDs, one with 200 pages and one with 300 pages. However, this never happens; a requester in this scenario would receive a single CD containing 500 pages. A requester who requested a 2000-page document and only received 500 pages would receive them all on a single CD, even if multiple reviewers worked on different parts of the document.

The fact that FBI consistently releases CDs with approximately 500 pages per CD in cases in which records have been withheld belies FBI's argument here and suggests a much more

straightforward process. *After* all responsive pages have been processed, FBI breaks them down into 500-page "pieces" to run through Integrity. If this is the case, however, all of FBI's protestations regarding how much easier, faster, and more efficient this policy is for "reviewing officials, subject matter experts, and other components or agencies that must be consulted before release" (*id*.) are completely without meaning and border on the disingenuous.

For the foregoing reasons, the Court should deny summary judgment to FBI and grant it to Plaintiffs.

## III.  DOJ'S FEE WAIVER DETERMINATIONS

Assuming *arguendo* that the Court accepts all of the arguments put forth by DOJ and does not find that it is precluded from making any of them, DOJ's arguments are still without merit and based on a flawed understanding of the relevant case law. First, to be "publicly available" for the purposes of a fee waiver denial, a record must be publicly accessible with a relatively minor degree of difficulty, which the DOJ records were not. Second, the fact that DOJ will release records if you pay a fee does not render them "publicly available" for fee waiver purposes. Third, a document does not have to be "meaningfully informative" *in a vacuum* to still contribute to an increased public understanding of government activities. Fourth, DOJ was incorrect to substitute its own value judgment for NSC's regarding the latter's ability to analyze the responsive records.

As NSC argued to DOJ, the geographic distribution of the responsive records makes it extremely unlikely that even if a requester were able to determine which districts held court records, he/she would be able to secure copies of the relevant documents. Many U.S. district courts did not start filing court documents electronically until around 2005, and some (such as the Eastern District of Virginia) began even later than that. For court filings from before the era

of ECF (such as the majority of the records requested), a requester must personally visit the courthouse or archive and review the court records himself to select documents for duplication, unless he is willing to pay for the duplication of the entire case file in order to obtain one document; Court Clerks' offices generally refuse as a matter of policy to perform any searches for particular documents in a case file (as is their right). Accordingly, availability in courthouses across the country is significantly inferior even to availability in an agency's FOIA reading room, which has been found to not constitute "on the public record." *See Fitzgibbon v. Agency for Int'l Dev.*, 724 F. Supp. 1048, 1051 (D.D.C. 1989) (requester's publication of the information sought would be much more likely than the agency's reading room "to contribute significantly to public understanding" of agency practices); *see also Campbell v. DOJ*, 164 F.3d 20, 36 (D.C. Cir. 1999) ("The mere fact that material is in the public domain does not justify denying a fee waiver; only material that has met a threshold level of public dissemination will not further 'public understanding' within the meaning of the fee waiver provisions."); *Coal. for Safe Power, Inc. v. Dep't of Energy*, No. 91-0078 (D.D.C. Sept. 10, 1991) (fee waiver granted to non-profit public interest organization even though document requested was available in agency's public reading room).

In order to perform any meaningful comparative analysis of these records, especially with respect to inter-district comparisons, it is necessary to obtain records from across the country, which is not financially feasible for any single requester, especially a non-profit organization. With that in mind, DOJ's primary conclusion is clearly flawed, and NSC should receive a public interest fee waiver.

DOJ's second argument in defense of the "publicly available" determination fares no better than the first, and in many ways is far worse. DOJ would have the Court find that if an

agency will release a record to a requester, then that requester is not eligible for a public interest fee waiver. The logical inverse of this is that the only requesters who would be eligible for a public interest fee waiver would be those who request records which will not be released. This is such a patently meritless argument that it does not really warrant further discussion.

DOJ's third argument centers on the idea that DOJ cannot imagine how NSC plans to use the information requested, because, to DOJ, the information is not "meaningfully informative." (DOJ's Mem. at 20.) Regarding Request No. 145-FOI-10718, DOJ claims that "[t]he requested list of FOIA cases by itself is not 'meaningfully informative' about how FOIA cases are assigned" (*id.*), but that is irrelevant. If a requester can take the information and deduce meaning from it by applying his own knowledge and other extrinsic information, then that information will be likely to contribute to an increased public understanding of the subject. At least one court that has carefully considered a related issue has held that "neither the statute nor the Department of Justice guidelines permit an agency to make a *de novo* determination as to the intrinsic value of the subject matter on which the information is requested." *Ettlinger v. FBI*, 596 F. Supp. 867, 875 (D. Mass. 1984). While the agency may evaluate "whether the subject matter is one in which there is some objectively demonstrable interest by some segment of the public," it may not "substitute its own judgment for that of an objectively reasonable judgment by the requester as to the scholarly, historical or academic value of the particular subject of the requesters' research." *Id.* The *Ettlinger* court exhaustively reviewed cases demonstrating that "courts have consistently overturned agency denials of fee waivers when requesters have made a legitimate, objectively supportable showing of using the requested information for scholarly research into political and historical events." *Id.*

To put it simply, if a requester has a list of FOIA cases assigned to U.S. Attorneys' Offices across the country, and another list of FOIA cases assigned to Civil's Federal Programs Branch ("FPB"), he may develop hypotheses regarding the common threads linking the cases in each list and thereby begin the process of developing a predictive model, which he can test against future case assignments. While it is true that a list of cases assigned to the FPB may not have a lot of meaning taken in isolation, NSC was not taking it in isolation (in fact, it was combining it with all of the declarations requested in Request No. 145-FOI-10719, not to mention other extrinsic sources of information), and DOJ's assumption was unsupportable. *Accord Citizens for Resp. & Ethics in Wash. v. HHS*, 481 F. Supp. 2d 99, 114-15 (D.D.C. 2006) (finding that requester was not required to disclose a particularized plan for the analysis and publication of the information obtained).

This argument ties in closely with DOJ's remaining major argument, in which it claims that NSC failed to demonstrate an ability to do the type of analysis it promised. DOJ argues that "the Court must consider the information sought based on its 'intrinsic informational content' alone" because it believes the task of reading briefs and comparing them to each other to be beyond NSC's expertise. (*See* Def.'s Mem. at 21-22.) Conveniently, when NSC attached an example of the type of analysis it would perform to a request letter, DOJ claimed that "no such attachment was included" (*id.* at 21 n.7); a claim easily disproven by reviewing the email in which the request was sent and its attachments, attached as Ex. C. As can clearly be seen in that email, a *single Adobe Acrobat file* including a five-page letter and a six-page excerpt from a

16

brief was attached to the email—a fact which makes it *impossible* for Mr. Kovakas to have not received the sample as well as the letter.[10]

Reviewing the Administrative Record as it actually existed, as opposed to the patchwork presented by DOJ, it is clear that NSC—a law firm which specializes in FOIA and national security law—possesses the necessary expertise to perform the analyses it proposed. Without that argument, DOJ's case rests solely on the fact that NSC failed to tell it how many hits its website receives—a burden it does not have to meet. (DOJ's Mem. at 22.) DOJ places much weight on a single case—*Perkins v. Dep't of Vet. Affairs*, 754 F. Supp. 2d 1, 7 (D.D.C. 2010)—but that case cannot support so much. *Perkins* involved highly technical data only understood by experts in a relatively arcane field; this case involves court filings. All things considered, the Court should adopt the Tenth Circuit's reasoning: "Given that Congress intended courts to liberally construe the fee waiver requests of noncommercial entities, [NSC] should get the benefit of the doubt." *Forest Guardians v. DOI*, 416 F.3d 1173, 1181-82 (10th Cir. 2005) (citing *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987)).[11]

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied and Plaintiff's Cross-Motion for Partial Summary Judgment should be granted. Alternatively, the Court should order discovery regarding the discrepancies in the Administrative Record.

---

[10] The sent email, complete with attachments, remains on the undersigned's computer, and the undersigned would be happy to physically show this evidence to the Court should it doubt the veracity of this claim.

[11] Oddly enough, *Forest Guardians* involved records which were argued to be "publicly available" because they were filed "in courthouses across the west." *Forest Gaurdians*, 416 F.3d at 1181 ("The information, therefore, is publicly accessible in only the grossest sense.")

Date:   November 7, 2013

                        Respectfully submitted,

                        /s/ Kelly B. McClanahan
                        Kelly B. McClanahan, Esq.
                        D.C. Bar #984704
                        National Security Counselors
                        1200 South Courthouse Road
                        Suite 124
                        Arlington, VA  22204
                        301-728-5908
                        240-681-2189 fax
                        Kel@NationalSecurityLaw.org

                        *Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY COUNSELORS, *
*et al.*, *
                                            *
      Plaintiffs, *
                                            *
      v. *      Civil Action No. 1:13-cv-00556 (RC)
                                            *
DEPARTMENT OF JUSTICE, *
                                            *
      Defendant. *
                                            *
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT
OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

        Pursuant to Local Civil Rule 7(h) of the Rules of the United States District Court for the District of Columbia, Plaintiffs hereby admit all facts in Defendant's Statement of Material Facts Not in Genuine Dispute, with eight exceptions.

        7.       Admit that FBI instituted a policy of limiting electronic releases of responsive records to 500 pages per CD, but deny that this policy affects efficiency.

        8.       Deny.

        9.       Deny.

        10.     Deny.

        11.     Deny.

        12.     Deny.

        13.     Deny.

        14.     Admit that FBI made such a determination, but deny that it is correct.

Date:   November 7, 2013

                                      Respectfully submitted,

                                      /s/ Kelly B. McClanahan
                                      Kelly B. McClanahan, Esq.
                                      D.C. Bar #984704
                                      National Security Counselors
                                      1200 South Courthouse Road
                                      Suite 124
                                      Arlington, VA  22204
                                      301-728-5908
                                      240-681-2189 fax
                                      Kel@NationalSecurityLaw.org

                                      *Counsel for Plaintiffs*