**Kel McClanahan, Esq.**

| | |
|---|---|
| **From:** | Kel McClanahan, Esq. [kel@nationalsecuritylaw.org] |
| **Sent:** | Saturday, September 17, 2011 9:48 AM |
| **To:** | 'Civil.routing.FOIA@usdoj.gov' |
| **Subject:** | 2 new FOIA requests |
| **Attachments:** | 145-FOI-10191 et al - 2011-09-19 - DOJ - FOIA-PA declarations (Part II).pdf; 145-FOI-xxxxx - 2011-09-19 - DOJ - Federal Programs Branch FOIA cases.doc |

Please find attached 2 FOIA requests.

---
This electronic mail (email) transmission is meant solely for the person(s) to whom it is addressed.  It contains confidential information that may also be legally privileged.  Any copying, dissemination or distribution of the contents of this email by anyone other than the addressee or his or her agent for such purposes is strictly prohibited.  If you have received this email in error, please notify me immediately by telephone or email and purge the original and all copies thereof.  Thank you.

Kel McClanahan, Esq.
Executive Director
National Security Counselors

"As a general rule, the most successful man in life is the man who has the best information."
Benjamin Disraeli, 1880

"Quis custodiet ipsos custodes?" ("Who watches the watchers?")
Juvenal, Satire VI

Ex. C

# NATIONAL SECURITY COUNSELORS

1200 SOUTH COURTHOUSE ROAD
SUITE 124
ARLINGTON, VA 22204

—

TELEPHONE: (301) 728-5908
FACSIMILE: (240) 681-2189

KEL MCCLANAHAN, ESQ., EXECUTIVE DIRECTOR (admitted in NY, DC)
EMAIL: KEL@NATIONALSECURITYLAW.ORG
BRADLEY P. MOSS, ESQ., DEPUTY EXECUTIVE DIRECTOR (admitted in IL, DC)
EMAIL: BRAD@NATIONALSECURITYLAW.ORG

19 September 2011

James M. Kovakas
Freedom of Information/Privacy Act Officer
Civil Division
U.S. Department of Justice
Room 7304, 20 Massachusetts Avenue, NW
Washington, DC 20530-0001

Re:    FOIA Request – FOIA/PA declarations (Part II)

Dear Mr. Kovakas:

This is a request on behalf of National Security Counselors ("NSC") under the Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, for copies of **all sworn declarations made by agency representatives as part of certain FOIA or Privacy Act litigation between 2002-2006, inclusive.** This includes the respective *Vaughn* indices that would accompany such declarations, as well as all exhibits (except for requester correspondence). This request should be limited to only those cases in which one of the following agencies was a defendant: Federal Bureau of Investigation ("FBI"), Department of Justice ("DOJ"), Central Intelligence Agency ("CIA"), Department of State ("State"), National Security Agency ("NSA"), Defense Intelligence Agency ("DIA"), or Department of Defense ("DOD"). If it would simplify your search, you may also limit your search to only those cases for which FOIA or the Privacy Act was the primary cause of action. If a Privacy Act case, we are only interested in cases where the requester was seeking to *obtain* records, not amend them or allege a violation of privacy interests.

For obvious reasons, the only cases for which the Civil Division would have records are those in which the Federal Programs Branch was involved. We stipulate that we are only interested in those cases. Also, please exclude any prisoners' cases.

If you deny all or part of this request, please cite the specific exemptions you believe justify your refusal to release the information or permit the review and notify us of your appeal procedures available under the law. In excising material, please "black out" rather than "white out" or "cut out." In addition, I draw your attention to President Obama's 21 January 2009 *Memorandum for the Heads of Executive Departments and Agencies*, directing federal agencies to adopt a presumption in favor of disclosure and stating that government information should not

be kept confidential "merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears."

We are hereby requesting classification as a representative of the news media. NSC is a non-profit organization under Virginia law, has the ability to disseminate information on a wide scale, and intends to use information obtained through FOIA in original works. According to 5 U.S.C. § 552(a)(4)(A)(ii), codifying the ruling of *Nat'l Security Archive v. Dep't of Defense*, 880 F.2d 1381 (D.C. Cir. 1989),

> the term "a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience.

NSC has clear intent to "publish[ ] or otherwise disseminate[ ] information to the public." *Id.* at 1386 (quoting the following legislative history: 1) "It is critical that the phrase 'representative of the news media' be broadly interpreted if the act is to work as expected. . . . In fact, *any person or organization which regularly publishes or disseminates information to the public . . . should qualify for waivers as a 'representative of the news media.'*" 132 Cong. Rec. S14298 (daily ed. Sept. 30, 1986) (emphasis in original quotation); 2) "A request by a reporter or other person affiliated with a newspaper, magazine, television or radio station, *or other entity that is in the business of publishing or otherwise disseminating information to the public* qualifies under this provision." 132 Cong. Rec. H9463 (Oct. 8, 1986) (emphasis in original quotation)). Our website, where much of the information received through our FOIA requests is posted for all to review, can be accessed at http://www.nationalsecuritylaw.org. In addition, we also intend to use information obtained through FOIA in our own published opinion editorials, journal articles, and the like. I personally have already published information received through FOIA in this manner (Kel McClanahan, *A Perception Based Model for Comparing Intelligence Communities,* 25(2) AMER. INTELLIGENCE J. 46 (Winter 2007/2008) (includes material obtained through a CIA FOIA request)), and our Document Vault contains summaries of the records we have obtained, as well as analyses of their relevance. Therefore, in accordance with the Freedom of Information Act and relevant case law, NSC should be considered a representative of the news media.

We are also requesting a public interest fee waiver. There can be no question that the information sought would contribute to the public's understanding of government operations or activities and is in the public interest. Sworn declarations made in FOIA and Privacy Act cases are often the only way that requesters learn about how intelligence agencies process these requests, and by compiling a record of all the arguments and justifications made over a span of time, it will be possible to shine some light on this process, with the intent of hopefully reducing the need for unnecessary litigation, and therefore will clearly contribute to the public's understanding of government operations or activities.

In anticipation of your argument, raised in a previous case (No. 145-FOI-10191), that these records would not contribute significantly to public understanding because they are publicly available in the files of the district courts in which the cases were reviewed, we maintain that this is not a sufficient basis for denying our request for a fee waiver because the records do not meet the test for "on the public record." The geographic distribution of these records makes

it extremely unlikely that even if a requester were able to determine which districts held court records, he/she would be able to secure copies of the relevant documents. Many U.S. district courts did not start filing court documents electronically until around 2005, and some (such as the Eastern District of Virginia) began even later than that. For court filings from before the era of ECF (such as the records requested herein), a requester *must* personally visit the courthouse or archive and review the court records himself to select documents for duplication, unless he is willing to pay for the duplication of the entire case file in order to obtain one document; Court Clerks' offices generally refuse as a matter of policy to perform any searches for particular documents in a case file (as is their right). We believe that availability in courthouses across the country is significantly inferior to availability in an agency's FOIA reading room, which has been found to not constitute "on the public record," especially when the geographic spread of the court records is considered compared with the centralized files of the Federal Programs Branch. In order to perform any meaningful comparative analysis of these records, especially with respect to inter-district comparisons, it is necessary to obtain records from across the country, which is not financially feasible for any single requester, especially a non-profit organization.

The DC District Court has held that availability in an agency's reading room is not sufficient reason to find that the records were "on the public record." *See Fitzgibbon v. Agency for Int'l Dev.*,724 F. Supp. 1048, 1051 (D.D.C. 1989) (requester's publication of the information sought would be much more likely than the agency's reading room "to contribute significantly to public understanding" of agency practices); *see also Coal. for Safe Power, Inc. v. Dep't of Energy*, No. 91-0078 (D.D.C. Sept. 10, 1991) (fee waiver granted to non-profit public interest organization even though document requested was available in agency's public reading room). To put it simply, if availability in a public reading room is not sufficient to qualify as "on the public record," then distribution in courthouses across the country is definitely not sufficient compared to our stated intent to make the records available in their raw form in one convenient place and incorporate them into our published research on the matter.

With respect to Request No. 145-FOI-10191, you also voiced the concern that reading these declarations and *Vaughn* indices would not allow us to improve the public's understanding of the way the agencies in question implement FOIA because the most that the public would learn from these records was that agencies made the arguments and claims in their declarations that were calculated to win the cases, which "everyone knows already." However, this concern is based on your opinion of the value of the material requested, which according to the relevant case law, an agency is not allowed to consider. At least one court that has carefully considered this issue has held that "neither the statute nor the Department of Justice guidelines permit an agency to make a *de novo* determination as to the intrinsic value of the subject matter on which the information is requested." *Ettlinger v. FBI*, 596 F. Supp. 867, 875 (D. Mass. 1984). While the agency may evaluate "whether the subject matter is one in which there is some objectively demonstrable interest by some segment of the public," it may not "substitute its own judgment for that of an objectively reasonable judgment by the requester as to the scholarly, historical or academic value of the particular subject of the requesters' research." *Id*. The *Ettlinger* court exhaustively reviewed cases demonstrating that "courts have consistently overturned agency denials of fee waivers when requesters have made a legitimate, objectively supportable showing of using the requested information for scholarly research into political and historical events." *Id*. We believe that these declarations and *Vaughn* indices will tell far more than "the simple fact

that the agencies made the best legal arguments they could," and that at the very least the raw statistical data mined from these records regarding exemptions would prove valuable to any person attempting to model the respective agencies' FOIA implementation procedures, policies, patterns, and practices.

As an example of the type of analysis made possible by reviewing multiple declarations, I have attached an excerpt from a brief recently filed with the DC District Court, in which I compared multiple State declarations submitted over time to demonstrate the prevalence of boilerplate language regarding certain exemptions. While this particular document was not written as a scholarly work of analysis, the goal of this request is to obtain a significantly larger sample size of declarations from which we *can* perform similar unbiased analyses for a white paper or journal article on this and related issues.

I also specifically state for the record our unwillingness to pay any fees for this request except as specifically noted below. Please do not delay the processing of this request by needlessly requesting further confirmation of this unwillingness to pay fees or terminate the processing of this request for failure to provide you with such confirmation. This statement is a full and unequivocal refusal to pay *any* fees for this request except as specifically noted below.

Please ensure that, in accordance with the DC Circuit's ruling in *Chambers v. Dep't of the Interior*, 568 F.3d 998 (D.C. Cir. 2009), all records potentially responsive to this FOIA request are immediately preserved from destruction until the final resolution of this FOIA action. Destruction of potentially responsive records after the receipt of a FOIA request is considered "contumacious conduct" by the DC Circuit. *See id.* at 1004.

The DOJ is required by law to respond to this request within 20 working days. Failure to timely comply may result in the filing of a civil action against your agency in a United States District Court.

Please provide any records produced in response to this request in electronic (soft-copy) form. Please provide soft-copy records by email or on a CD if email is not feasible. If DOJ policy is to charge a fee for the creation of a CD, we do agree to pay a reasonable fee for the creation of *one* CD, which should be sufficient to hold any responsive records. However, if a public interest fee waiver is granted, the previous statement is moot, as we expect that this will waive the charges for any CDs as well, thereby allowing the DOJ to release the soft-copy records to us free of charge.

If you find that you will be spending a length of time considering our request for news media status and/or a public interest fee waiver (which would include any intention on your part of initially denying either and forcing us to appeal), please continue searching for the minimum two hours of search time to which we are entitled regardless and provide all records located during that time (which due to their electronic nature will not entail duplication charges beyond the possible charge for the creation of one CD). In such a case, where you are working with a limited amount of initial search time, please prioritize your search in the following manner:

· Search for more recent cases first and work your way back;

·       Search for agencies in order in which they are listed in this request; and

·       Do a complete search for one year before beginning another.

For example, your search would proceed as follows:

1.      Search for all FBI cases from 2006;
2.      Search for all DOJ cases from 2006;
3.      Search for all CIA cases from 2006;
4.      Search for all State cases from 2006;
5.      Search for all NSA cases from 2006;
6.      Search for all DIA cases from 2006;
7.      Search for all DOD cases from 2006;
8.      Search for all FBI cases from 2005;
9.      Search for all DOJ cases from 2005;
10.     Etc.

If you wish, I will be happy to work with you to narrow the scope of this request in the following manner. If you provide me with a list of the cases which match the description of the records sought, I will go through the list and specify which cases we wish to receive declarations for. I cannot provide such a list on my own at this point, however, because I have no way of reliably determining which cases were assigned to the Federal Programs Branch and which cases were assigned to a U.S. Attorney's Office.[1]

Your cooperation in this matter would be appreciated. If you wish to discuss this request, please do not hesitate to contact me.

Sincerely,

Kel McClanahan
Executive Director

---

[1] Establishing a pattern regarding this issue is also one of the goals of this research.

## 2. State has not convincingly demonstrated that all of the alleged "foreign government information" was obtained in confidence.

As noted above, one of the linchpin inquiries when making a determination regarding §
1.4(b) of E.O. 13526 is whether the information was provided to the United States "with the
expectation that the information, the source of the information, or both, are to be held in
confidence." E.O. 13526 § 6.1(s). "To carry this burden, the government need[s] to 'provide the
court and [Plaintiff] with information sufficient to determine whether the source was truly a
confidential one and why disclosure of the withheld information would lead to exposure of the
source.'" *Rosenfeld v. DOJ*, 57 F.3d 803, 807 (9th Cir. 1995), quoting *Wiener*, 943 F.2d at 980;
*see also Wiener*, 943 F.2d at 980 (applying Exemption (7)(D) tests for express and implied grants
of confidentiality to § 1.4(b) claims).

In order to establish an express grant of confidentiality, State "need only establish the
[source] was told his name [or information] would be held in confidence." *Wiener*, 943 F.2d at
986. Given the "substantial weight" granted to declarations in national security matters (*King*,
830 F.2d at 217), this could likely be accomplished by saying as much in the Grafeld Declaration.
Yet, Ms. Grafeld has not done so. More likely, given the vague and conclusory language of the
Grafeld Declaration, State is maintaining the presence of an implied grant of confidentiality.
However, State has not provided enough information beyond rote statements that material was
"obtained in confidence" to allow Plaintiff or the Court to determine the legitimacy of these
claims.

State has a longtime practice of offering "boilerplate" declarations that do not meet the
*King* test. The Grafeld Declaration is no exception. State is particularly reluctant to give
specifics when it comes to the "foreign government information" protected by E.O. 13526 §

25

1.4(b).  In recent years, virtually identical sweeping language has appeared in no less than five

declarations offered by State to defend its withholding of records under §§ 1.4(b) and (d),

sometimes accompanied by a rider which actually discusses the specific issue, and sometimes (as

in this case) without even that.  In this case, Ms. Grafeld declares:

> An essential understanding that governs all diplomatic intercourse, and that
> constitutes an essential element in all successful diplomatic exchanges, is that
> confidentiality will be observed.  Mutual trust in this realm is vital for the
> development of cordial and productive diplomatic relations.  Unwillingness or
> inability to maintain confidentiality in diplomatic exchanges would inevitably
> chill our relations with other countries and lead to diminished access to sources of
> information important to the successful formulation and implementation of U.S.
> foreign policy, and thereby would damage the national security.
>
> Information that the U.S. Government obtained in confidence from foreign
> government officials is withheld from documents described in this declaration.
> The ability to obtain information from foreign governments is essential to the
> formulation and successful implementation of U.S. foreign policy.  Disclosure of
> foreign government information provided in confidence, either voluntarily by the
> Department or by order of a court, would cause foreign officials to believe that
> U.S. officials are not able or willing to observe the confidentiality expected in
> such interchanges.  Governments would become less willing in the future to
> furnish information important to the conduct of U.S. foreign relations, and in
> general less disposed to cooperate with the United States in the achievement of
> foreign policy objectives of common interest.

(Grafeld Decl. ¶¶ 67-68 (citations omitted).)

> On September 17, 2010, Ms. Grafeld declared:
>
> *Information that the U.S. Government obtained in confidence from foreign
> government officials is withheld from* one document *described in this declaration.
> Diplomatic exchanges* are premised upon, and depend upon an expectation *that
> confidentiality will be observed.  Mutual trust* between governments *in this realm
> is vital* to U.S. foreign relations.  The *inability* of the United States *to maintain
> confidentiality in* its *diplomatic exchanges would inevitably chill relations with
> other countries*.  It *would damage the national security* by *diminishing* our *access
> to* vital *sources of information.*
>
> *The ability to obtain information from foreign governments is essential to the
> formulation and successful implementation of U.S. foreign policy.  Disclosure of
> foreign government information provided in confidence, either voluntarily by the*

> *Department or by order of a court, would cause foreign officials to believe that U.S. officials are not able or willing to observe the confidentiality expected in such* exchanges. *Governments would become less willing in the future to furnish information important to the conduct of U.S. foreign relations, and in general less disposed to cooperate with the United States in the achievement of foreign policy objectives of common interest.*

Declaration of Margaret Grafeld ¶¶ 33-34 [hereinafter *Darui* Grafeld Decl.], *Darui v. Dep't of State*, No. 09-2093, 2011 U.S. Dist. LEXIS 73848 (D.D.C. July 11, 2011) (emphasis added for language that duplicates this case).

On June 8, 2009, Celeste Houser-Jackson[14] declared:

> An essential understanding that governs all diplomatic intercourse, and that constitutes an essential element in all successful diplomatic exchanges, is that confidentiality will be observed.  Mutual trust in this realm is vital for the development of [cordial and] productive diplomatic relations.  Unwillingness or inability to maintain confidentiality in diplomatic exchanges would inevitably chill our relations with other countries and lead to diminished access to sources of information important to the successful formulation and implementation of U.S. foreign policy, and thereby would damage the national security.

> [Information that the U.S. Government obtained in confidence from foreign government officials is withheld from documents described in this declaration.] The ability to obtain information from foreign governments is essential to the formulation and successful implementation of U.S. foreign policy.  Disclosure of foreign government information provided in confidence, either voluntarily by the Department or by order of a court, would cause foreign officials to believe that U.S. officials are not able or willing to observe the confidentiality expected in such interchanges.  Governments would become less willing in the future to furnish information important to the conduct of U.S. foreign relations, and in general less disposed to cooperate with the United States in the achievement of foreign policy objectives of common interest.

Houser-Jackson Decl. at 27-28 (alterations represent the 22 words that are present in this case but absent from the Houser-Jackson Declaration).

---

[14] Ms. Houser-Jackson was the Acting Director of the Office of Information Programs and Services during Ms. Grafeld's absence.  Declaration of Celeste Houser-Jackson ¶ 1, *Gov't Accountability Proj. v. Dep't of State*, 699 F. Supp. 2d 97 (D.D.C. 2010).

On March 13, 2009, Ms. Grafeld declared:

An essential understanding that governs all diplomatic intercourse, and that constitutes an essential element in all successful diplomatic exchanges, is that confidentiality will be observed. Mutual trust in this realm is vital for the development of *cordial and* productive diplomatic relations. Unwillingness or inability to maintain confidentiality in diplomatic exchanges would inevitably chill our relations with other countries and lead to diminished access to sources of information important to the successful formulation and implementation of U.S. foreign policy, and thereby would damage the national security.

The ability to obtain information from foreign governments is essential to the formulation and successful implementation of U.S. foreign policy. Disclosure of foreign government information provided in confidence, either voluntarily by the Department or by order of a court, would cause foreign officials to believe that U.S. officials are not able or willing to observe the confidentiality expected in such interchanges. Governments would become less willing in the future to furnish information important to the conduct of U.S. foreign relations, and in general less disposed to cooperate with the United States in the achievement of foreign policy objectives of common interest.

*ACCG* Grafeld Decl. at 28-29 (emphasis added to show the two words that differentiate this declaration from the Houser-Jackson Declaration). As far back as 2007, Ms. Grafeld submitted a declaration containing virtually identical language as the *ACCG* Grafeld Declaration, only substituting "The ability to obtain information from foreign governments . . ." with "Such information . . ." and adding one sentence to the beginning of the second paragraph: "Information that the U.S. Government obtained in confidence from foreign government officials is withheld from 17 documents described in this declaration." Declaration of Margaret Grafeld ¶¶ 18-19 [hereinafter *Miller* Grafeld Decl.], *Miller v. DOJ*, 562 F. Supp. 2d 82 (D.D.C. 2008).

While Plaintiff concedes that there is a role for "boilerplate" language in declarations, it is only useful when followed by specifics. For instance, in *Ancient Coin Collectors Guild*, Ms. Grafeld immediately followed the above quoted language with the sufficiently specific sentence, "The risk of harm to U.S. foreign relations is particularly clear where, as here, each of the foreign

governments that provided information has expressly reached a joint agreement with the United

States whereby information confidentially exchanged with it relating to import restrictions under

the Convention cannot be publicly released, and [the withheld documents] contain such

confidential information." *ACCG* Grafeld Decl. at 29-30 (then describing an "express mutual

understanding regarding information exchanged in confidence" and discussing how State

consulted with a foreign government regarding release of the material). By doing so, Ms. Grafeld

sufficiently alleged the existence of an express grant of confidentiality.

However, *Ancient Coin Collectors Guild* has proven the exception in that regard. In

*Government Accountability Project*, the Houser-Jackson Declaration offered the conditional

statement, "Given the sensitive and often charged politics of the Middle East, the nature and

extent of cooperation with the U.S. is *frequently* a subject that foreign governments want and

expect to be treated confidentially." Houser-Jackson Decl. ¶ 29 (emphasis added) (then

summarily stating without factual support that each piece of information withheld under § 1.4(b)

was obtained "in confidence [from foreign government officials] [during] the conduct of U.S.

foreign relations" (*id.* ¶¶ 42, 57, 59, 60, 77, 79, 85, 97, 119)). In *Darui*, Ms. Grafeld did not even

provide that much information, limiting her argument to, "In view of the close relationship

between the United States and Saudi Arabia, protecting foreign government information is

particularly important to our relationship and conduct of foreign relations," accompanied by an

unsupported statement that the document in question expresses the "confidential views" of the

Kingdom of Saudi Arabia. *Darui* Grafeld Decl. ¶ 34.

However, the Grafeld Declarations in *Miller* and this case manage to provide even *less*

particularized information than even *Darui*. In *Miller*, Grafeld provides *no* particularized

analysis after the "boilerplate" language, and the only evidence she offers to demonstrate that the

29

specific information withheld was "confidential" (as required by § 1.4(b)) consists of tautological implications that it *is* confidential. *See Miller* Grafeld Decl. ¶¶ 69 ("These conversations were held with a clear expectation of privacy . . . ."), 81 ("[Telegrams] include information provided by St. Kitts officials and indicate involvement at important levels of the island's government."), 93 ("The information withheld contains frank commentary on the Kittian justice system, including . . . information obtained from foreign governments."), 107 ("The withheld material in . . . these documents . . . discusses U.S. government options, in cooperation with top officials of the government of St. Kitts . . . .").

In none of these remaining declarations (nor in this case) did State make any mention of express grants of confidentiality or, in fact, of any factual reasons that the Court should find the existence of an implied grant. State's entire argument appears based on the questionable philosophy that *all* exchanges of information between foreign government officials and the United States come with implied grants of confidentiality. All of these declarations even call that an "essential understanding." (*See*, *e.g.*, Grafeld Decl. ¶ 67.) If the Court adopts this position, then it would effectively remove most if not all of State's records from the reach of FOIA, since by definition almost everything State does involves the exchange of information with foreign governments. Such a decision would leave FOIA requesters at the mercy of the whims of State FOIA analysts, who could decide that any piece of information they do not want to release is classified because it contains "foreign government information." Instead, this Court is encouraged to follow the more practical lead of the 9th Circuit (vis-à-vis *Wiener*, which has already been adopted for one point of law in the D.C. Circuit) and the District of Connecticut, which held: